IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| v. ) | CRIMINAL NO. 3:2006-17 |
| ) | |
| VERONICA QUINTANILLA, ) | JUDGE GIBSON |
| ) | |
| Defendant. ) | |

# MEMORANDUM OPINION and ORDER OF COURT

**GIBSON, J.**

This matter comes before the Court on the Defendant's Motion to Suppress (Document No. 25). The Defendant is currently under indictment for the use and possession of a counterfeit alien registration receipt card in violation of 18 U.S.C. § 1546(a). The Defendant was a passenger in a commercial vehicle stopped for its excessive speed on the Pennsylvania Turnpike near Somerset, Pennsylvania. The Defendant contends that the state trooper's request for identification from the Defendant during the traffic stop was in fact an "illegal search and seizure in violation of the Fourth Amendment" and that all subsequent statements should be suppressed as being "fruits of the poisoness tree." A suppression hearing was held on September 7, 2006. Defendant's Motion, pp. 1, 3. For the reasons stated herein, the Defendant's motion will be denied.

## I. Findings of Fact

1. On March 6, 2006, Pennsylvania State Police Trooper Jack Baker (hereinafter "Trooper Baker") was working "radar detail on the Pennsylvania Turnpike" and made a stop of a tractor trailer at "11:05 a.m." because it was traveling "75 [miles per hour] in a posted 65 miles per hour speed zone." Transcript of suppression hearing (hereinafter "T")(Document No. 31), pp. 4-5, 8; Government Exhibits 5, 6, 7.

2. Trooper Baker observed the tractor trailer speeding at Mile Post 119 and then began to follow it and attempt to stop it "in the area of Mile Post 115" by activating his unmarked patrol vehicle's emergency lights and siren, but the tractor trailer continued on until Trooper Baker pulled his vehicle in front of the tractor trailer, applied his brakes and "pointed" with his finger to the tractor trailer at which time it stopped at Mile Post 113.3 at "approximately 11:07[a.m.]". T, pp. 5-6, 8, 21.

3. Trooper Baker thereafter approached the tractor trailer, requested the driver's "log book, his record of duty status" and requested that the driver drive to the "service plaza which was about 4/10 of a mile up the road" in order to address "the traffic issues." T, pp. 7, 8, 22.

4. The driver of the tractor trailer did pull into the service plaza at Mile Post 112.2 at approximately 11:15 a.m., Trooper Baker followed the driver into the service plaza, called "Trooper [Mark] Hogan" (hereinafter "Trooper Hogan") who was assigned to the "motor carrier safety detail on that day" so that Trooper Hogan could inspect the tractor trailer and then "approached" the driver, requested his operator's license, vehicle registration, "shipping papers and medical card" and while doing so noticed that the driver had a passenger in the passenger's seat. T, pp. 7-10, 11, 22, 24-26, 28, 30, 32, 33-34, 48.

5. Trooper Baker obtained the requested documentation from the driver and told the driver that another officer was coming to inspect his tractor trailer and while waiting for Trooper Hogan to arrive, Trooper Baker began to request records checks on the driver's information through his "dispatch center" and began to issue citations for the driver. T, pp. 8-10.

6. Trooper Baker did not speak to the passenger, but inquired of the driver, Jose Mestanza (hereinafter "Mestanza") concerning her identity and Mestanza indicated that she was his wife. T, pp. 10, 16.

7. It took Trooper Hogan approximately ten minutes to arrive at the service plaza; the information being obtained from the dispatch center also took approximately ten minutes to arrive and this information was being provided to Trooper Baker as Trooper Hogan arrived. T, pp. 10, 11-12, 19-20, 34, 35.

8. At the time of Trooper Hogan's arrival, Trooper Baker gave Trooper Hogan Mestanza's documentation. T, p. 17.

2

9.  Trooper Hogan then walked to the passenger side of the tractor trailer, began talking to Mestanza and observed two female passengers in the sleeper berth; after it was apparent that the passengers did not respond to his request for identification because of an inability or a lack of desire to speak English, Trooper Hogan, through Mestanza speaking Spanish to the passengers, requested a form of identification from the passengers in an attempt to confirm if the passengers had authorization from the trucking company to be in the tractor trailer.   T, pp. 35-36, 38-39, 52.

10. Trooper Hogan does not "speak or understand the Spanish language." T, p. 38.

11. Trooper Hogan inquired of Mestanza if he had authorization to transport passengers and Mestanza indicated that he did not; no other legal basis was given by Mestanza as to why the passengers were present in the tractor trailer. T, pp. 38, 47-48.

12. One of the passengers observed by Trooper Hogan was the Defendant who was seated directly behind the driver's seat and not in the passenger's seat, and she indicated three times through Mestanza's translation that she did not have identification. T, pp. 36, 38-41, 58-59.

13. Trooper Hogan then told Mestanza that he was going to call Immigration and Customs Enforcement (hereinafter "ICE"), walked from the tractor trailer back to Trooper Baker to discuss what he was intending to do with regard to the motor vehicle inspection and then returned to the tractor trailer and at that time was handed two alien registration receipt cards with pictures of the passengers by Mestanza. T, pp. 41-42, 51, 58-59; Government Exhibit 2.

14. Suspecting that the two alien registration receipt cards were not genuine because "the card quality was poor, the pictures weren't proportional" and "the holograms weren't there", Trooper Hogan telephoned ICE and indicated that he believed he had two counterfeit alien registration receipt cards, relayed the information on those cards and thereafter began his Level I[1] inspection of the tractor trailer while awaiting the arrival of the ICE officers. T, pp. 42-43, 59-60.

15. After Trooper Hogan began the Level I inspection of the tractor trailer, Mestanza remarked that the passenger was not his wife. T, p. 16.

---

[1] A Level I inspection was described by Trooper Hogan as "bumper to bumper, tire to roof. I inspect everything from the lug nuts on the tire, braking system, the hoses, the cab, the cab components, the interior of the cab, up to–including the lights on the top of the box semi-trailer or whatever it happens to be at that particular time, even including the cargo." T, p. 31. Trooper Hogan was trained by the Pennsylvania State Police and PUC federal instructor in motor carrier inspections and is considered a "Qualified Commonwealth Employee." T, pp. 31-32.

3

16. Trooper Hogan completed his inspection of the tractor trailer at 12:54 p.m., issued two citations to Mestanza, one citation for each unauthorized passenger he was transporting. T, pp. 43-44, 46, 49.

17. Trooper Baker also issued three citations that day to Mestanza after the completion of Trooper Hogan's inspection: one for an expired commercial driver's license, a second for a failure to stop "when required for emergency vehicle" and a third for "maximum speed limits" and Mestanza subsequently was found guilty of all three citations. T, pp. 12, 15, 20, 53; Government Exhibits 5, 6, 7.

18. One of the passengers was transported back to the Somerset State Police Barracks by Trooper Baker, who did not ask any questions of the passenger, and the other passenger was transported by Trooper Hogan; they all arrived at the Pennsylvania State Police Barracks in Somerset at approximately 1:05 p.m. and thereafter the ICE agents arrived at the Barracks at approximately 1:40 p.m. T, pp. 29, 49-50, 55.

19. Trooper Hogan had no formal training in identifying counterfeit "identification cards or alien registration cards" but possessed only his nineteen years of experience of looking at "alien cards" while working on the Pennsylvania Turnpike. T, pp. 50-51, 54.

## II. Conclusions of Law

1. The Fourth Amendment to the United States Constitution reads: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV.

2. Probable cause must exist in order to justify the traffic stop of a motor vehicle because a stop of a motor vehicle "constitutes a 'seizure' of 'persons' within the meaning of [the Fourth Amendment.]" However, the "[s]ubjective intentions [of police officers] play no role in ordinary, probable-cause Fourth Amendment analysis." *Whren v. United States*, 517 U.S. 806, 809-810, 813, 116 S.Ct. 1769, 1772, 1774, 135 L.Ed.2d 89, 95, 98 (1996)(citations omitted). *See also U.S. v. Mosley*, 454 F.3d 249, 252, 253 (3d Cir. 2006).

3. Probable cause is evaluated based upon a totality of the circumstances approach. *Maryland v. Pringle*, 540 U.S. 366, 371, 124 S.Ct. 795, 800, 157 L.Ed.2d 769, 775 (2003);*U.S. v. Glasser*, 750 F.2d 1197, 1205-1206 (3d Cir. 1984); courts must also review the totality of the circumstances when determining if reasonable suspicion existed in a given situation. *U.S. v. Arvizu*, 534 U.S. 266, 273, 122 S.Ct. 744, 750, 151

L.Ed.2d 740, 749 (2002).

4. Trooper Baker possessed probable cause to conduct a traffic stop of the tractor trailer based upon the objective factor of timing the tractor trailer at 75 miles per hour in a sixty-five miles per hour speed zone on the Pennsylvania Turnpike.

5. Trooper Baker also possessed probable cause to conduct a traffic stop of the tractor trailer after it failed to stop when approached by Trooper Baker's unmarked police car that had its emergency lights and siren activated.

6. The initial traffic stop of the tractor trailer at Mile Post 113.3 when Trooper Baker directed Mestanza to drive to the nearby service plaza in order for Trooper Baker to obtain all the necessary information and documentation from Mestanza in a safer location revealed that Mestanza had a passenger, a circumstance known to Trooper Baker in his duties as a Pennsylvania State Trooper that required documentation in order for a passenger to be permitted to be transported in such a commercial vehicle.

7. Pennsylvania law concerning the interstate and intrastate operation of commercial motor vehicles[2] has adopted the requirements of the Code of Federal Regulations at 49 C.F.R. § 392.60 as to the transportation of persons by a commercial motor vehicle. 67 Pa.Code §§ 229.171, 231.171. 49 C.F.R. § 392.60(a) reads:

> (a) Unless specifically authorized in writing to do so by the motor carrier under whose authority the commercial motor vehicle is being operated, no driver shall transport any person or permit any person to be transported on any commercial motor vehicle other than a bus. When such authorization is issued, it shall state the name of the person to be transported, the points where the transportation is to begin and end, and the date upon which such authority expires. No written authorization, however, shall be necessary for the transportation of:
>
> (1) Employees or other persons assigned to a commercial motor vehicle by a motor carrier;
> (2) Any person transported when aid is being rendered in case of an accident or other emergency;
> (3) An attendant delegated to care for livestock.

---

[2] A commercial motor vehicle is defined for purposes of the Pennsylvania Code at 67 Pa.Code §§ 229.2, 231.2; neither party disputes the fact that the tractor trailer is encompassed within the regulatory scope of these two provisions and thus subject to the requirements of 49 C.F.R. § 392.60 as adopted by Pennsylvania.

5

8. "After a traffic stop that was justified at its inception, an officer who develops a reasonable, articulable suspicion of criminal activity may expand the scope of an inquiry beyond the reason for the stop and detain the vehicle and its occupants for further investigation." *U.S. v. Mosley*, 454 F.3d 249, 252 (3d Cir. 2006)(citing *U.S. v. Givan*, 320 F.3d 452, 458 (3d Cir. 2003).

9. The observation of a passenger by Trooper Baker justified the further exploration of the existence of permission by the trucking company for the presence of such a passenger.

10. Mestanza's comment that the passenger was his "wife" is not one of the bases upon which a passenger may be transported by Mestanza in a commercial vehicle such as his tractor trailer and thus provides an additional basis for reasonable suspicion to inquire whether authorization for transporting a passenger existed.

11. Thus, Trooper Baker possessed "a reasonable articulable suspicion" that provided a reason to expand the traffic stop to investigate if Mestanza had permission to transport passengers from his employer or whether one of the three circumstances under 49 C.F.R. § 392.60 that do not require written permission for the transporting of passengers was present.

12. Nothing in Fourth Amendment jurisprudence requires that this further investigation into the status of Mestanza's passenger be completed by Trooper Baker under these circumstances and the later questioning of the passenger by Trooper Hogan through Mestanza's translation and his ultimate request for identification from the Defendant was a proper expansion of the subject matter of the traffic stop in light of the information obtained by Trooper Baker and conveyed to Trooper Hogan who followed up on this matter through further questioning.[3]

---

[3] It is not clear from the record created at the suppression hearing as to what the basis was for the Level I inspection of the tractor trailer: it is clear that probable cause existed to suspect a speeding violation by its driver, and a reasonable, articulable suspicion existed to inquire as to the existence of the authorization to transport passengers as the only explanation for the presence of a passenger is the statement that she was allegedly Mestanza's "wife". Of the three bases for Level I inspections of tractor trailers offered by Trooper Hogan ("probable cause of a violation of the statutes of the Commonwealth"; "systematic inspection[s]"; and PennDOT's "weights and measures" T, pp. 32-33 ), he classified this inspection as one based upon a violation of the Pennsylvania Vehicle Code for "speeding". T, p. 33. The issue of whether a moving violation such as "speeding" would provide probable cause to expand a traffic stop for such a violation into a bumper to bumper mechanical inspection of a tractor trailer was not developed or addressed at the suppression hearing or in the suppression motion and related documents. If this issue was to be addressed it appears that a traffic stop based upon a tire that exploded in view of a State Trooper or a failed turn signal would provide sufficient probable cause to conduct a mechanical inspection of a tractor trailer. However, during a traffic stop to cite a tractor trailer driver for speeding, if no observations or information known to the police officer establish probable cause to believe other violations, specifically mechanical violations are present, the detaining of a tractor trailer and its driver to conduct a Level I inspection would appear

13. There is no evidence that the questioning of the Defendant by Trooper Hogan through Mestanza's translation was done under circumstances of threats or any means of coercion as Trooper Hogan conducted his inquiries with the help of Mestanza's translation while the Defendant and Mestanza were seated in the tractor trailer on the driver's side of the cab of the trailer and Trooper Hogan stood outside of the passenger's side door.

14. It is established law in this circuit that the length of a traffic stop based upon a speeding violation is limited to the time necessary to issue a speeding citation unless further justification, based upon at least a reasonable, articulable suspicion, that a separate offense has occurred or is occurring and under such circumstances further detention would be warranted. *See U.S. v. Givan*, 320 F.3d 452, 458 (3d Cir. 2003); *Karnes v. Strutski*, 62 F.3d 485, 491 (3d Cir. 1995) (citing *Berkemer v. McCarty*, 468 U.S. 420, 437-438, 104 S.Ct. 3138, 3149 (1984)); "A seizure that is justified solely by the interest in issuing a warning ticket to the driver can become unlawful if it is prolonged beyond the time reasonably required to complete that mission." *Illinois v. Caballes*, 543 U.S. 405, 407, 125 S.Ct. 834, 837, 160 L.Ed.2d 842, 846 (2005).

15. Trooper Baker was completing the speeding citation, but had not yet issued it to Mestanza at the time Trooper Hogan arrived on the scene and proceeded to complete the further investigation concerning the identity of the one known passenger at that time and thus, the length of the traffic stop was not delayed beyond a reasonable time. *See U.S.*

---

to be legally questionable. Resolution of this issue would, of course, be dependent upon the specific existent facts.

Regardless, in the case *sub judice*, the circumstances permitted expansion of the traffic stop for "speeding" into the area of documentation and identification of Mestanza's passengers. Trooper Baker's testimony at first was not directed to the specific issue of unauthorized passengers. Trooper Baker indicated that he requested Trooper Hogan by radio to inspect the vehicle based upon the following: "At that time I did ask him for the identification, driver's license, registration, logbook. At that time, due to the violations that I observed and him failing to immediately stop, made me a little curious about what he was doing. At that time I did call Trooper Hogan, who was working the motor carrier safety detail on that day, to inspect the vehicle as well." T. p. 8; "...I thought there may be other vehicle violations and what not in the vehicle there." T, p. 8; "At that time I did believe that there was maybe more violations on the vehicle." T, p. 10. Trooper Baker later testified that he did not pursue the passenger authorization subject because he referred this part of the investigation to Trooper Hogan. T, p. 17. Trooper Baker also testified that it is "common practice" to refer matters concerning violations with "commercial motor vehicles" to the trooper working the "motor carriers" "detail" if such a trooper was presently assigned to this "detail" at that particular time and date. T, pp. 25-26. Therefore, it appears that Trooper Baker had a basis to request Trooper Hogan to conduct the investigation into the violation of unauthorized passengers. As previously stated, the issue of the validity of the Level I inspection is not the issue before this Court, and it does not affect the validity of the investigation into the violation of unauthorized passengers which is a separate issue.

7

                *v. Shabazz*, 993 F.2d 431, 437 (5th Cir. 1993)(questioning of driver pending outcome of computer check of his license did not "extend the duration of the initial, valid seizure").

16. "[T]he usual traffic stop is...[more] analogous to a so-called 'Terry stop,' than to a formal arrest"; the character of a Terry stop is "nonthreatening" and as such "persons detained pursuant to such stops are not 'in custody' for purpose of Miranda"; during a Terry stop "the officer may ask the detainee a moderate number of questions to determine his identity and to try to obtain information confirming or dispelling the officer's suspicions" regarding the detainee, "[b]ut the detainee is not obliged to respond." *U.S. v. Cummings*, Criminal No. 3:2005-3, slip op. at 8-9 (W.D.Pa. Nov. 22, 2005)(citing *Berkemer v. McCarty*, 468 U.S. 420, 439, 440, 104 S.Ct. 3138, 3150, 82 L.Ed.2d 317, 334-335 (1984)).

17. Questioning of the driver as to any "travel plans" or his/her relationship with the passengers within the vehicle are within the "proper scope of a traffic stop." *U.S. v. Hernandez*, 93 F.3d 1493, 1499 (10th Cir. 1996). *See also U.S. v. Rivera*, 867 F.2d 1261, 1263 (10th Cir. 1989).

18. A police officer may also question the occupants of a vehicle during a traffic stop to "verify information provided by the driver." *U.S. v. Foley*, 206 F.3d 802, 805 (8th Cir. 2000).

19. The questioning of a lawfully detained individual (including questioning regarding a detainee's immigration status) that does not prolong the detention does not equate to a illegal seizure under the Fourth Amendment and thus, such questioning itself need not be based upon an reasonable suspicion. *Muehler v. Mena*, 544 U.S. 93, 100-101, 124 S.Ct. 1465, 1471-1472, 161 L.Ed.2d 299 (2005); *see also U.S. v. Torres-Monje*, 433 F.Supp.2d 1028, 1032 (D.N.D. 2006)(recognizing that questioning of the passengers of a vehicle engaged in a traffic stop prior to completion of the traffic stop is permissible).

20. Trooper Hogan's request for identification from the two passengers was legally proper and did not prolong the traffic stop of Mestanza's tractor trailer and the passengers' production of said identification was not the product of coercion, duress or threatening words, gestures or the posturing of Trooper Hogan.

21. Troopers Baker and Hogan possessed probable cause that a vehicle code violation had occurred in that unauthorized passengers were being transported based upon review of the identification cards produced, the inconsistency of Mestanza's explanation as to the identity of one of his passengers, and knowledge of the lack of evidence demonstrating that any of the three exceptions which permit carrying passengers in commercial vehicles was applicable.

22. The delayed production of the counterfeit resident alien identification cards in response to Trooper Hogan's earlier request for identification from the passengers and the fact that in Trooper Hogan's experience he had seen many genuine resident alien identification cards provided Trooper Hogan with sufficient bases[4] upon which to form a reasonable suspicion that the resident alien identification produced by the Defendant was counterfeit, which resulted in Trooper Hogan contacting ICE regarding the counterfeit identification cards and ICE agents indicated that they would travel to Somerset to investigate the matter.

23. Because Trooper Hogan's request for identification was not an illegal seizure under the Fourth Amendment, the subsequent statements of the Defendant are not "fruit" of an illegal seizure and need not be excluded from introduction into evidence against her. *See Wong Sun v. U.S.*, 371 U.S. 471, 484- 486, 83 S.Ct. 407, 415- 416, 9 L.Ed. 441, 453- 454 (1963).

Therefore, based upon the foregoing findings of fact and conclusions of law, the Court must deny the Defendant's Motion.

An appropriate Order follows.

---

[4] The additional circumstance of the Defendant's inability to speak English caused Trooper Hogan to have to rely upon Mestanza to act as an interpreter and, therefore, Trooper Hogan could not be certain that the Defendant's information was being provided to him accurately. This, to a lesser degree, also provided some basis for contacting ICE.

**AND NOW**, this 22nd day of November, 2006, in accordance with the foregoing Memorandum Opinion, IT IS HEREBY ORDERED THAT the Defendant's Motion to Suppress (Document No. 25) is DENIED.

>                    **BY THE COURT:**
>
>                    _____
>                    **KIM R. GIBSON,**
>                    **UNITED STATES DISTRICT JUDGE**